

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JRS:AMR/JRS
F. #2023R00084

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 18, 2024

By Email and ECF

The Honorable James R. Cho
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Keyon McLaughlin
     Docket No. 24-CR-419 (DLI)

Dear Judge Cho:

  The government respectfully submits this letter in support of the government's motion for an order of detention as to defendant Keyon McLaughlin, whose initial appearance is scheduled before Your Honor later today. The defendant is charged in the above-captioned indictment with Hobbs Act robbery, attempted Hobbs Act extortion, bank fraud, aggravated identity theft, and transmission of threats. As described in further detail below, the defendant engaged in brazenly violent conduct and terrorized his victim ("Victim-1") and Victim-1's family physically, emotionally, and financially for weeks. In light of the nature of the charged offenses, as well as additional dangerous criminal conduct by the defendant, there is no combination of conditions that would reasonably assure the community's safety and the defendant's continued appearance. Accordingly, the government respectfully requests that the Court order the defendant be detained pending trial.

I. Background

  A. The Instant Offense

  In August 2022, the defendant used Craigslist to advertise the illegal sale of prescription drugs. Victim-1 saw the defendant's advertisement and contacted the defendant in the hope of purchasing Xanax and marijuana. The defendant then directed Victim-1 to travel to the defendant's housing complex in Brooklyn in order to complete the sale.

  When Victim-1 arrived at the housing complex, the defendant directed Victim-1 to go to the roof of a building where the defendant was laying in wait. Upon Victim-1's arrival on the roof, the defendant robbed Victim-1 with a large knife, threatening to stab him and ultimately taking a cell phone, credit cards, and cash.

In the days that followed, the defendant continued to threaten, harass and attempt to extort Victim-1. Using Victim-1's stolen cell phone, the defendant sent threatening messages to Victim-1, including, "I will becoming [sic] to your home" and "I'll be coming to check up on you." The defendant also used contact information for Victim-1's family members on the stolen cell phone and began to threaten them as well. In one such message, the defendant told Victim-1's family member, "[Victim-1] Owns [sic] Me Money I Gave Him Enough Time To Pay So Now It's Gets Physical If He Would've Paid What He Owe We WOULD BE GOOD." Contemporaneously, the defendant also used Victim-1's stolen cell phone to access certain of Victim-1's financial accounts through mobile applications that had been installed on the cell phone. The defendant made purchases using these accounts and transferred cash from Victim-1's accounts into his own.

Certain of Victim-1's accounts, however, required an additional password to access. On August 14, 2022, the defendant lured Victim-1 to meet with him under the guise that he planned to return Victim-1's stolen property; in reality, the defendant's goal was to obtain the password to Victim-1's financial accounts. Upon meeting with Victim-1 on a public sidewalk, the defendant said he had a firearm and threatened to shoot Victim-1 unless Victim-1 gave up the password. When Victim-1 refused and tried to run away, the defendant gave chase and then assaulted Victim-1 in broad daylight. As captured on surveillance video, the defendant punched Victim-1 in the face, causing Victim-1 to fall to the sidewalk. Victim-1 eventually gave the defendant the password. The defendant fled the scene, and Victim-1 was transported to the hospital, bleeding and with bruises on his face. Victim-1's wounds required four stitches to close. The image from surveillance video below shows the defendant standing over Victim-1 after knocking Victim-1 to the ground.



In the days that followed his physical assault on Victim-1, the defendant continued to access Victim-1's financial accounts and to transfer and withdraw money from them. In total, the defendant stole over $17,000 from Victim-1. After Victim-1 reported to the relevant financial institutions that these thefts had occurred, the defendant was locked out of Victim-1's financial accounts. Nevertheless, in the weeks that followed, the defendant continued to contact Victim-1, threatening Victim-1 and Victim-1's family with additional physical violence and even death. Portions of messages that the defendant sent to Victim-1 in August and September 2022 are excerpted below:

- "I'm going to kill you . . . this not [sic] a game I will look for you until I find you harm your family I am coming to get if I don't get my money [sic] and you talking to police made it worst for you so you let me know how this goes or turns out for you"

- "I know you remember when I punch you in the face for not having my money so look you can go to police go to I know where you live where your grandkids and children live I need my money I would destroy you"

- "Be safe I know where your child grand children live so ima show u better then I can tell u"

- "I had your device I got all locations of your family better luck next time but I will find em"

Members of law enforcement recovered these messages after seizing and searching the defendant's cell phone in April 2023. His cell phone was recovered when officers executed a warrant to search an apartment in which the defendant and several known gang members were located. Even though the officers had a legally authorized warrant to search the apartment, the defendant and these gang members barricaded themselves inside and refused to open the door for the officers for hours. Once officers breached the door, the officers seized a nine-millimeter firearm and a .45-caliber firearm, both of which had certain parts removed and concealed elsewhere in the apartment. The parts that had been removed from the firearms were found in the apartment's refrigerator, hidden in a pot of chili and a container of pasta.

B.    The Defendant's Continued Use of Craigslist to Sell Drugs

After committing the charged criminal conduct against Victim-1, the defendant continued to use Craigslist to sell narcotics and inflict serious harm. On June 25, 2023—approximately eight months after the criminal conduct charged in the instant indictment—the defendant connected with another individual ("Victim-2") through Craigslist and arranged to sell Xanax and Adderall to Victim-2. The next day, June 26, 2023, the defendant delivered the drugs to Victim-2's apartment building in Manhattan. Roughly twelve hours after the defendant sold these controlled substances to Victim-2, Victim-2's fiancée called 911 and reported that Victim-2 had turned blue in the face and was no longer breathing. Victim-2 was rushed to the hospital, where he ultimately died days after ingesting the drugs the defendant had sold.

Following Victim-2's death, an autopsy was performed, which listed the cause of death as acute intoxication due to the combined effects of fentanyl, acetylfentanyl, and amphetamine. In addition, medical personnel recovered blue and orange pills from Victim-2's person. The blue pills tested positive for the presence of fentanyl while the orange pills tested positive for the presence of methamphetamine.[1]

Even after Victim-2 died from the misrepresented drugs that the defendant had sold, the defendant continued to peddle potentially lethal fentanyl into the community. On four subsequent occasions between June and August 2023, the defendant sold to an undercover law enforcement officer what he advertised to be Xanax and Adderall. In fact, these drugs—which were consistent in appearance with the blue and orange pills that were recovered from Victim-2's person—likewise tested positive for fentanyl and methamphetamine.

On December 12, 2023, the defendant was arrested and charged in the Southern District of New York with selling drugs to Victim-2 and the undercover officer. He was subsequently charged by indictment with five counts of distributing fentanyl and methamphetamine, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C). See United States v. Keyon McLaughlin, No. 24-CR-30 (NRB) (S.D.N.Y.). That case remains ongoing.

C.   The Defendant's Post-Arrest Criminal Conduct

While under the supervision of Pretrial Services in the Southern District of New York and subject to a bond that includes, as a condition of his release, that he not violate federal, state, or local law while on release, the defendant has twice been arrested. On June 14, 2024, the defendant choked, strangled, and punched his former romantic partner in the face with a closed fist. He was arrested on July 11, 2024 and charged with assault in the third degree, criminal obstruction of breathing, attempted assault in the third degree, and harassment in the second degree. On August 30, 2024, the defendant left a cell phone repair store without paying the fee for services the store had provided; he was arrested on September 6, 2024 and charged with petit larceny. The government is unaware of any pretrial violations filed in connection with these arrests.

Furthermore, just this morning, members of law enforcement visited the address the defendant provided to Pretrial Services in an attempt to arrest him pursuant to the arrest warrant related to the instant charges. An occupant of that residence told the officers, in sum and substance, that the defendant had not lived at this address for approximately two months. Another member of the defendant's family told the officers that this family member had not spoken to the defendant in approximately two months. The defendant did not provide any updated address to his supervising Pretrial Services officer.

---

[1]   This factual account is adapted from the sworn affidavit submitted in the Southern District of New York in support of a complaint charging the defendant with distributing fentanyl and methamphetamine. See United States v. Keyon McLaughlin, 23-MJ-7538-UA (S.D.N.Y.), ECF No. 1, Dec. 12, 2023.

4

II.     Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." Id. "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

The government may proceed by proffer to establish facts relevant to a detention determination. United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

III.  Argument

    A.  The Defendant Is Eligible for Detention Under Section 3142(f)

The defendant has been charged with both robbery and attempted extortion under the Hobbs Act, which are "crimes of violence" for purposes of 18 U.S.C. § 3143(f)(1)(A). See United States v. Santora, 225 F. App'x 21, 22 (2d Cir. 2007) (upholding district court's finding for pretrial detention purposes that defendant "had committed a crime of violence, specifically conspiracy to commit extortion" (citing 18 U.S.C. § 3142(e)); United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a "crime of violence" as that term is defined by the BRA [Bail Reform Act]."); United States v. Molina, No. 19-CR-449 (NSR), 2022 WL 3041237, at *1 (S.D.N.Y. Aug. 2, 2022) ("the offense of Hobbs Act robbery is a 'crime of violence'" under the Bail Reform Act because it has as an element "the use, attempted use, or threatened use of physical force," or that present "a substantial risk that physical force . . . may be used") (citing 18 U.S.C. § 3156(a)(4)).[2] The defendant is therefore eligible for detention.

    B.  Detention Is Warranted

No bail package will protect the community from the danger posed by the defendant or mitigate the risk of his flight. Each of the factors set forth in 18 U.S.C. § 3142(g) weigh heavily in favor of his pretrial detention.

First, the defendant is exceptionally dangerous. As charged in the instant indictment, the defendant held Victim-1 at knifepoint, and several days later, punched Victim-1 directly in the face and threatened to shoot Victim-1. For weeks thereafter, the defendant continued to threaten both Victim-1 and Victim-1's family with additional physical violence, including death. And the defendant has repeatedly demonstrated that his threats are not empty. Just a few months ago, he was arrested for choking and punching his romantic partner in the face despite being on pretrial supervision in a case that could result in years-long imprisonment. See Mercedes, 254 F.3d at 437 ("While we have never explicitly held that prior acts of domestic violence are relevant to a determination of dangerousness, we have cited with approval a case from another circuit which noted that 'we reject [defendant's] suggestion that his acts of 'domestic' violence do not support a finding of dangerousness to the community. A willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others.'") (citing United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990)).

The defendant's history of violence reflects that these crimes are not momentary lapses in judgment, but rather deliberate decisions that the defendant has made over and over again

---

[2] The Second Circuit has made clear that United States v. Davis, 139 S. Ct. 2319 (2019), and its progeny have no impact on the definition of "crime of violence" under the Bail Reform Act. See, e.g., United States v. Watkins, 940 F.3d 152, 167 (2d Cir. 2019) (explaining that the Bail Reform Act "does not define criminal offenses, fix penalties, or implicate the dual concerns [of fair notice and preventing arbitrary enforcement] underlying the void-for-vagueness doctrine, it is not amenable to a due process challenge and is therefore not unconstitutionally vague"); see also United States v. Bush, No. 18-CR-907 (PAC), 2021 WL 371782, at *2 (S.D.N.Y. Feb. 3, 2021).

to engage in violence against vulnerable people and threaten to do them harm. This pattern of violence poses a significant danger to the community if he is released that cannot be (and has not been) mitigated by conditions of release. See United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community."); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package").

Furthermore, the defendant has demonstrated his dangerousness even beyond the charged criminal conduct here. A "court is not limited to only considering the charges pending against a defendant when 'assessing the degree of danger posed by a defendant's release.'" United States v. Barnes, No. 23-MR-551, 2024 WL 33740, at *5 (W.D.N.Y. Jan. 3, 2024) (quoting United States v. Bruno, 89 F. Supp. 3d 425, 430 (E.D.N.Y. 2015)); see also United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996) ("Nor is the dangerousness of a defendant determined solely by looking at the acts charged in the indictment. There is no requirement of a nexus between the charged conduct and the basis of a court's conclusion that a defendant is a serious danger to the community. This Court therefore may look beyond the charged conduct to assess the degree of danger that the defendant poses."). As described above, the defendant is charged in the Southern District of New York with selling lethal narcotics, including selling a dose of mislabeled fentanyl that ultimately led to the user's death. The defendant chose to line his pockets with cash in total disregard for the devastating toll that injuries and deaths caused by opioid overdoses impose on the community. Because courts define "dangerousness" to encompass "'the danger that the defendant might engage in criminal activity to the detriment of the community,'" it is clear that the defendant has endangered the community through his drug sales. Millan, 4 F.3d at 1048 (quoting legislative history). "[T]he harm to society caused by narcotics trafficking," United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985), unquestionably poses a danger to the community, and thus warrants the defendant's detention.

Second, as set forth above, the weight of the evidence against the defendant is extremely strong. The government anticipates that at a trial on the charged offenses, it would introduce, among other evidence, surveillance video footage capturing the defendant's physical attack on Victim-1, cell phone and other electronic records documenting the violent threats he sent to Victim-1 and Victim-1's family, and financial records showing the movement of funds he stole from Victim-1's financial accounts. Where, as here, the evidence of guilt is strong, it provides "a considerable incentive to flee." Millan, 4 F.3d at 1046; see also United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight").

Moreover, the government currently estimates that for purposes of the United States Sentencing Guidelines (the "Guidelines"), the advisory Guidelines range of imprisonment for the indicted offenses could be as high as over 12 years of imprisonment if he is convicted at trial,

7

which includes a two-year mandatory minimum on the aggravated identity theft count.³ The likelihood of a lengthy term of imprisonment gives the defendant a strong incentive to flee and greatly minimizes any risk that pre-trial detention would result in an over-served sentence. See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee"); United States v. Brennerman, 705 Fed. Appx. 13, 15 (2d Cir. 2017) (upholding pretrial detention where defendant faced Guidelines range of 57 to 71 months' imprisonment); United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").

Third, the defendant's history and characteristics weigh heavily in favor of detention. As described above with respect to the defendant's criminal history, even after committing the charged conduct here, and even while under the supervision of Pretrial Services in the Southern District of New York, the defendant has continued to steal and to use violence. This "failure to comply with the most basic condition of supervision—ceasing criminal activity—shows that he cannot be trusted to abide by conditions of pretrial release no matter how strict." United States v. Lynch, No. 20-CR-202 (LAP), 2020 WL 2145363, at *3 (S.D.N.Y. May 5, 2020). By committing two new offenses while on pretrial supervision, the defendant has demonstrated that he cannot be expected to follow this Court's instructions, and therefore he cannot be expected to comply with the terms of any pretrial supervision imposed here.

Finally, the defendant has an ability to flee given his significant ties outside of this jurisdiction and his access to other people's personal identifying information. The investigation has shown that the defendant has spent significant time in the North Carolina area, where he was arrested in December 2023 in connection with his charges in the Southern District of New York. These out-of-state connections heighten his ability and incentive to flee if released.

Moreover, the defendant has failed to keep his Pretrial Services officer apprised of where he is living as required by the conditions of his release. Just this morning, an occupant of the residence the defendant has reported to Pretrial Services told law enforcement officers that for approximately two months, the defendant has not been living at that residence (and therefore has been violating his terms of his release), and another member of his family reported not speaking to him for approximately two months. This behavior further shows his ability to evade pretrial supervision and law enforcement detection, ignore court orders, and flee. That ability would not be mitigated by the use of electronic monitoring. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology").

---

³ At this juncture, the government preliminarily estimates that if the defendant is convicted at trial of the charged offenses, he would face a Guidelines range of 63 to 78 months of imprisonment on Count One, 18 to 24 months of imprisonment on Count Two, a mandatory consecutive term of 24 months of imprisonment on Count Three, 63 to 78 months of imprisonment on Count Four, and 33 to 41 months of imprisonment on Count Five.

In addition, as charged in the indictment, the defendant accessed financial records and other personal identifying information of Victim-1, which he used to impersonate Victim-1 and drain Victim-1's financial accounts. This demonstrated ability and willingness to assume another person's identity if he chooses to also increases the defendant's risk of flight and further supports his detention. See United States v. Sternquist, No. 22-MJ-1005 (RLM), 2022 WL 6162532, at *2 (E.D.N.Y. Oct. 8, 2022) ("For obvious reasons, this access to false identification devices increases the defendant's capacity for flight.").

IV.     Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendant's return to court and respectfully requests that he be detained.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
Andrew M. Roddin
James R. Simmons
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (JRC) (By ECF)
Counsel of Record (By Email and ECF)